**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOSE CRUZ; CIERRA INGRAM; MICHAEL LAMBARDO; DELFON STEPHENS; and BOBBIE WALLS, <br><br> Plaintiffs, <br><br> v. <br><br> TRANE INC.; TRANE RESIDENTIAL SYSTEMS; and JOHN DOES 1-5 AND 6-10, <br><br> Defendants. | Civil Action No. 3:19-cv-07324 |

## OPINION

Defendant Trane Inc. moves for summary judgment on Plaintiffs' New Jersey Law Against Discrimination ("NJLAD") claims for retaliation and racial harassment.[1]  For the reasons set forth below, Trane's motion is granted in part and denied in part.

I

A

Trane provides air conditioning systems and services.  ECF No. 30-2 ¶ 1. Plaintiffs Cruz, Ingram, Lombardo, Walls, and Stephens, all of whom identify as African American, worked at Trane.  ECF No. 30-2 ¶¶ 2, 4, 5, 8, 10, 11, 16.[2]  Leomar Nazco supervised Plaintiffs during the relevant time.  ECF No. 30-2 ¶¶ 18, 22.

---

[1] The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1332.
[2] Plaintiff Cruz also identifies as Afro-Latino.  ECF No. 30-2 ¶ 17.

1

1

Trane has an anti-harassment policy that prohibits harassment and discrimination on the basis of race, whether by supervisors, managers, co-workers, or third-party personnel.  ECF Nos. 30-20 at 2; 30-21.  Trane also has an anti-retaliation policy that prohibits retaliation against "any employee who has, in good faith, filed a complaint or who has participated in an investigation of a complaint."  ECF No. 30-20 at 4.

Under Trane's policies, an employee who believes he or she has been subject to harassment or discrimination must report the matter to a supervisor in his chain of command, Human Resource personnel, or the Trane ethics hotline.  ECF No. 30-20 at 3. An employee does not need to report harassment to a supervisor when the supervisor is involved in the conduct.  ECF No. 30-20 at 3.  After receiving a complaint, Human Resources is obligated to investigate the incident and issue appropriate discipline to those who violate company policy.  ECF No. 30-20 at 3.

2

The following is undisputed:  on April 17, 2018, Plaintiffs, Nazco, and two non-party coworkers, Berjonal Lesperance and Brandon Imirowicz, were together during a break when Nazco's desk phone rang.  ECF No. 30-2 ¶¶ 27, 30.  Nazco stated, "This is a prank call," and then picked up the phone, held the receiver to his ear, and listened.  ECF No. 30-2 ¶ 31.  Nazco then passed the phone to Imirowicz, who also listened to the call. ECF No. 30-2 ¶¶ 29, 34.  Nazco then placed the call on speakerphone, at which point a "Donald Duck-like voice" used the "n-word" and threatened violence.  Walls Dep. 67:10-68:8, 74:6-75:2, ECF No. 33-1; Stephens Dep. 89:23-92:15, ECF No. 33-2; Cruz Dep.

2

46:13-48:16, ECF No. 33-2; Ingram Dep. 80:8-23, ECF No. 33-3; Lombardo Dep. 68:17-70:17, ECF No. 33-3.  A second similar call occurred that day.

The parties dispute several details surrounding the April 17, 2018, incident.  First, the parties dispute what was said before the call was placed on speakerphone.  Nazco and Imirowicz suggested that others present expressed interest in the phone call, which prompted Nazco to place it on speakerphone.  ECF Nos. 30-28; 30-38 at 3.  Plaintiffs, however, testified that Nazco placed the call on speakerphone with no prompting.  Walls Dep. 71:9-14, ECF No. 33-1; Stephens Dep. 89:23-92:15, ECF No. 33-2; Cruz Dep. 47:5-8, ECF No. 33-2; Ingram Dep. 76:3-6, ECF No. 33-3; Lombardo Dep. 69:16-18, ECF No. 33-3.

Second, the parties dispute whether Nazco laughed during the call.  Plaintiffs testified that Nazco and Imirowicz laughed while listening to the call on the receiver, and that Nazco also laughed while the call played on speakerphone.  Walls Dep. 67:22-68:8, 77:6-17, ECF No. 33-1; Stephens Dep. 85:4-14, 89:25-90:5, ECF No. 33-2; Cruz Dep. 47:1-5, 52:4-8, ECF No. 33-2; Ingram Dep. 76:3-6, ECF No. 33-3; Lombardo Dep. 69:12-18, 72:24-73:22, ECF No. 33-3.  Lesperance testified that he heard only Nazco laugh, Lesperance Dep. 17:2-10, ECF No. 33-4, while Nazco testified that he did not recall laughing, Nazco Dep. 27:9-20, ECF No. 33-4.

Third, the parties dispute whether the caller made sexist remarks and used speech that was derogatory toward other races.  Plaintiffs and Imirowicz said the caller used the n-word and threatening and violent language.  Walls Dep. 68:1-5, ECF No. 33-1; Stephens Dep. 90:9-91:25, ECF No. 33-2; Cruz Dep. 47:12-16, 53:23-54:24, ECF No.

33-2; Ingram Dep. 80:13-81:24, ECF No. 33-3; Lombardo Dep. 69:20-24, 75:5-76:12, ECF No. 33-3; ECF No. 30-38.  By contrast, Nazco testified that, in addition to the n-word, the caller used slurs related to "almost all" of the races, including "spic" and "wasp."  ECF No. 30-2 ¶ 44.

Fourth, the parties dispute whether Nazco terminated the first call before or after the call concluded.  Walls and Cruz testified that the voice stopped and then Nazco hung up, whereas Ingram was unclear about whether the call ended before Nazco hung up, Walls Dep. 75:16-21, ECF No. 33-1; Cruz Dep. 55:15-24, ECF No. 33-2; Ingram Dep. 82:12-16, ECF No. 33-3, and Stephens and Lombardo could not recall, Stephens Dep. 92:16-18, ECF No. 33-2; Lombardo Dep. 76:23-77:4, ECF No. 33-3.  Nazco testified that he hung up the call, but it is unclear whether the call was ongoing when he hung up. Nazco Dep. 29:16-25, ECF No. 33-4.

Fifth, the parties' estimates of the call's duration differ.  Cruz, Ingram, Walls, and Lombardo all testified to the call lasting at least one minute.  Walls Dep. 75:22-77:5, ECF No. 33-1; Cruz Dep. 54:24-55:6, ECF No. 33-2; Ingram Dep. 82:22-83:4, ECF No. 33-3; Lombardo Dep. 77:10-80:6, ECF No. 33-3.  Stephens could not provide an estimate. Stephens Dep. 92:19-93:2, ECF No. 33-2.  By contrast, Nazco testified that the call lasted fifteen seconds, with the call being on speakerphone for five to ten seconds.  Nazco Dep. 23:23-24:15, ECF No. 33-4.

Finally, the parties dispute the circumstances surrounding a second call to the same desk phone.  Ingram testified that she was with Nazco and Walls in the office when the second call was received, which Nazco listened to on the receiver and then placed on

speakerphone.  Ingram Dep. 88:9-89:8, ECF No. 33-3.  She testified that the caller again used the n-word and violent language and that Nazco laughed before hanging up on the thirty second to one-minute-long call.  Ingram Dep. 89:19-90:14, ECF No. 33-3.  Walls testified that the second call came in approximately a minute or two after the first call, that Nazco did not listen on the receiver before placing the call on speakerphone, and that Nazco ended the call after approximately forty-five seconds.  Walls Dep. 110:5-112:12, ECF No. 33-1.  Cruz testified that he walked in at the "tail end" of the second call and heard the call over the speakerphone, Cruz Dep. 65:2-66:17, ECF No. 33-2, though Ingram and Walls testified that Cruz was not present, Ingram Dep. 88:15-18, 91:12-15, ECF No. 33-3; Walls Dep. 110:13-21, ECF No. 33-1.  Nazco testified that he received the second call, which was of the same nature as the first, during a second break, about two hours after the first call.  Nazco Dep. 31:7-9, 32:17-33:5, ECF No. 33-4.  Nazco testified that Cruz and "maybe one [or] two others" were present, and that he did not place the call on speakerphone.  Nazco Dep. 31:12-16, 32:11-13, ECF No. 33-4.

3

Two days after the calls, Cruz submitted a complaint to Human Resources concerning the first call.  He listed Plaintiffs names in the submission and all Plaintiffs testified that it was submitted on the group's behalf.  ECF No. 30-2 ¶¶ 67, 69-70; ECF No. 30-29 at 2.  On April 20, 2018, Laura Lipinski, a senior Human Resources employee, met with Cruz about the complaint.  ECF No. 30-2 ¶¶ 72-75.  She then proceeded to meet with all Plaintiffs, as well as Lesperance, ECF No. 30-2 ¶¶ 93-95, and collected written statements from Nazco and Imirowicz, ECF No. 30-2 ¶¶ 77-82, 98-104.  Lipinski also

made efforts to have the calls traced to identify their source but was unsuccessful. ECF No. 30-2 ¶¶ 86-88, and Nazco filed a police report, ECF No. 30-2 ¶ 89. Lipinski informed Plaintiffs of these developments. ECF No. 30-2 ¶¶ 91-92.

Lipinski told Nazco that Plaintiffs were "bothered" by his handling of the call and suggested that he apologize to each of them. ECF No. 30-2 ¶¶ 107-08. All Plaintiffs but Ingram reported receiving an apology from Nazco, ECF No. 30-2 ¶¶ 111, 118, and Nazco enrolled in a training class, was placed on a different shift, and was no longer Plaintiffs' supervisor.[3] ECF No. 30-2 ¶149. Plaintiffs were dissatisfied with the company's response but did not know what actions were taken against Nazco. ECF No. 30-2 ¶¶ 115-16.

4

After the call and Plaintiffs' HR complaint, three Plaintiffs assert that they suffered retaliation. Plaintiff Walls believes he did not receive Nazco's support in resolving an employee performance issue on three occasions. ECF No. 30-2 ¶¶ 121-24. Walls also contends that he was excluded from decision-making about product movement and vehicles on three occasions. ECF No. 30-2 ¶¶ 139-40, 142. He never raised either issue with Nazco or Human Resources. ECF No. 30-2 ¶¶ 125, 143. Walls was also sent to be drug tested. ECF No. 30-2 ¶¶ 121, 127-29. The company's policy provides for periodic random drug testing, and Walls had been randomly tested before 2018. ECF No.

---

[3] Plaintiffs additionally filed a complaint with the New Jersey Division on Civil Rights ("NJDCR") in August 2018. See ECF No. 33-2 at 42. There is no evidence in the record that Nazco knew about the NJDCR complaint.

30-2 ¶¶ 130, 132.  The drug test was negative, and Walls suffered no loss of job, pay, or hours, and was not demoted.  ECF No. 30-2 ¶ 133.  At the time of his deposition, Walls remained employed at Trane.  ECF No. 30-2 ¶ 10.

Plaintiff Ingram similarly believes Nazco did not support her in dealing with personnel issues after the April 2018 incident, though she could recall only one specific interaction.  ECF No. 30-2 ¶ 150-51.  Ingram admitted that Nazco told her he would speak to the employee about the issues she raised.  ECF No. 30-2 ¶ 152.

Ingram also received a warning for her behavior and was transferred to a new department.  On or about November 1, 2018, Ingram's then-supervisor, Ray Brown, issued her a warning for disruptive behavior, improper cellphone use, and wasting time.  ECF No. 30-2 ¶ 155.  Ingram testified that Brown said, "Not me, Leo," which she understood to mean that Nazco directed that he issue the warning, but she said that she did not know what he meant by his statement.  Ingram Dep. 137:1-8, ECF No. 33-3.  A written warning was issued on November 12, 2018, citing disruptive behavior, loafing, wasting time, or loitering during work hours, and improper cellphone use.  ECF No. 30-2 ¶ 156.  Ingram disputed the warning with Human Resources, though admitted that she had used her cellphone.  ECF No. 30-2 ¶¶ 157-58.  She ultimately received a corrected warning for only improper cellphone use.  ECF No. 30-43.  Ingram suffered no loss of job, pay, or hours, and was not demoted.  ECF No. 30-2 ¶ 161.  In 2019, Ingram was moved from Receiving to Shipping.  ECF No. 30-2 ¶¶ 164-65.  She was advised that the change was made for cross-training purposes.  ECF No. 30-2 ¶ 166.  At the time of her deposition, Ingram remained employed at Trane.  ECF No. 30-2 ¶ 6.

Plaintiff Stephens was "walked off the job" on November 7, 2018, and suspended for five days.  ECF No. 30-2 ¶¶ 170-71.  Stephens advised Nazco that an employee failed to clean up an area after finishing work.  ECF No. 30-2 ¶ 172.  Stephens then joined Nazco's conversation with the employee.  ECF No. 30-2 ¶ 173.  The employee told Nazco that Stephens knocked something over and asked the employee to clean it up.  ECF No. 30-2 ¶ 174.  Stephens interjected, and Nazco asked him to leave.  ECF No. 30-2 ¶ 175.  Stephens left the area and then returned, at which point the employee called Stephens a "cop," and Stephens told the employee they could go outside and see if Stephens's car had sirens on top.  ECF No. 30-2 ¶ 177.  After Nazco told Stephens this statement was "threatening," ECF No. 30-2 ¶ 178, Stephens "stormed off," returned, had "a few words" with Nazco, and then went to the breakroom and loudly told another coworker about the incident, ECF No. 30-2 ¶¶ 180-81.  At that point, Nazco escorted Stephens out of the building.  ECF No. 30-2 ¶ 182.  Stephens returned to work after five days and was issued a written warning for disruptive behavior.  ECF No. 30-2 ¶ 183.

Stephens was later moved from the Supermarket to Steel Receiving department, but maintained the same title, pay, and work hours after the change.  ECF No. 30-2 ¶¶ 189-90.  Like Ingram, he was informed that the change was for cross-training purposes.  ECF No. 30-2 ¶ 191.  In March 2019, Stephens was demoted and received a three-day suspension in accordance with company policy because he had accrued three

warnings and three work accidents.  ECF No. 30-2 ¶¶ 193-95.  Stephens left Trane in August 2019.[4]  ECF No. 30-2 ¶ 13.

## B

Plaintiffs filed suit in the New Jersey Superior Court, asserting racial harassment claims under NJLAD.  ECF No. 1-1.  Plaintiffs Ingram, Stephens, and Walls also brought retaliation claims under NJLAD.  ECF No. 1-1.  Trane timely removed, ECF No. 1, and now seeks summary judgment on both claims, ECF No. 30-1, which Plaintiffs oppose, ECF No. 33.  This matter was assigned to the undersigned for the limited purpose of resolving the motion for summary judgment.  ECF No. 36.

## II[5]

## A

The NJLAD prohibits race discrimination in the workplace.  N.J.S.A. § 10:5-12(a).  Hostile work environment claims under NJLAD occur "when an employer or

---

[4] In May 2018, Cruz stopped reporting to work.  ECF No. 30-2 ¶ 4.  At the time of his deposition, Lombardo remained employed at Trane.  ECF No. 30-2 ¶ 8.

[5] Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

In undertaking this analysis, a court views the facts in the light most favorable to the non-moving party.  The court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Id. at 249.  While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial."  Id. at 250.

fellow employees harass an employee because of his or her [protected characteristic] to the point at which the working environment becomes hostile." Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 452 (N.J. 1993).

To prevail on a race-based NJLAD hostile work environment claim, a plaintiff "must demonstrate that the defendant's conduct (1) would not have occurred but for the employee's [race]; and [the conduct] was (2) severe or pervasive enough to make a (3) reasonable [person in the same protected class] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Taylor v. Metzger, 706 A.2d 685, 688-89 (N.J. 1998).

The first prong of the hostile work environment claim requires a plaintiff to show by a preponderance of the evidence that he suffered discrimination because of a protected characteristic. Lehmann, 626 A.2d at 454. The perpetrator's intent is irrelevant, as the NJLAD is concerned with the effects of discrimination. Id.; see also Hurley v. Atl. City Police Dep't, 174 F.3d 95, 115 (3d Cir. 1999) ("Because the [NJ]LAD is not a fault or intent-based statute, a plaintiff 'need not show that the employer intentionally discriminated or harassed her, or intended to create a hostile work environment.'" (quoting Lehmann, 626 A.2d at 454)). A plaintiff need not be the target of harassing conduct for a hostile work environment claim to be actionable under the NJLAD. Cutler v. Dorn, 955 A.2d 917, 925-26 (N.J. 2008).

There are disputed material facts as to whether the April 2018 incidents occurred because of Plaintiffs' race. Most people present when the calls were placed on speakerphone were African American. ECF No. 30-2 ¶16; ECF No. 33 at 12 (discussing

Plaintiffs' testimony as to race in ¶¶ 1-5).[6]  Plaintiffs testified that Nazco and Imirowicz, who are not African American, laughed while listening to the call on the receiver, before it was placed on speakerphone.  Walls Dep. 67:22-68:8, 77:6-17, ECF No. 33-1; Stephens Dep. 85:4-14, 89:25-90:5, ECF No. 33-2; Cruz Dep. 47:1-5, 52:4-8, ECF No. 33-2; Ingram Dep. 76:3-6, ECF No. 33-3; Lombardo Dep. 69:12-18, 72:24-73:22, ECF No. 33-3.  The parties dispute the duration of the first call and whether Nazco laughed or stopped it before the call ended.  Compare Walls Dep. 75:16-77:5, ECF No. 33-1; Cruz Dep. 54:24-55:6, 55:15-24, ECF No. 33-2; Ingram Dep. 82:12-16, 82:22-83:4, ECF No. 33-3; Lombardo Dep. 76:23-80:6, ECF No. 33-3; Stephens Dep. 92:16-93:2, ECF No. 33-2, with Nazco Dep. 23:23-24:15, 27:9-20, 29:16-25, ECF No. 33-4.  A reasonable jury could conclude that the call lasted more than fifteen seconds and that Nazco did nothing to stop the racist epithets and threats from continuing, even if he did not hear any slurs before placing the call on speakerphone.  A jury could conclude that the failure to immediately end the call had a discriminatory effect on the listeners, who Nazco knew were African American.  See Cutler, 955 A.2d at 926-27.

There are also disputed facts concerning whether the calls were severe or pervasive.  To determine whether conduct is severe or pervasive, a court examines whether a reasonable person would believe the conditions of employment had been

---

[6] The circumstances of the second call are also in dispute.  Construing those facts in the non-movant's favor, a reasonable jury could conclude that Nazco placed it on speakerphone in the presence of Ingram and Walls, both of whom are African American, after already receiving one phone call from the same source using the n-word and threatening language.

altered and that the environment was hostile.  Shepherd v. Hunterdon Dev. Ctr., 803 A.2d

611, 625 (N.J. 2002).  This requires a court to consider "the surrounding circumstances,"

including any cumulative effect of various incidents.  Rios v. Meda Pharm., Inc., 252

A.2d 982, 987 (N.J. 2021) (internal citations omitted); Cutler, 955 A.2d at 925.

A single incident of harassing conduct can give rise to a hostile work environment

claim.  Taylor, 706 A.2d at 689, 691 (stating a supervisor's use of the term "jungle

bunny" toward a black employee, in the presence of others, had an "unambiguously

demeaning racial message that a rational factfinder could conclude was sufficiently

severe to contribute materially to the creation of a hostile work environment"); Rios, 252

A.3d at 989-90 (describing context for supervisor's use on two occasions of "spic").

This, however, "will be a rare and extreme case."  Lehmann, 626 A.2d at 455; Caver, 420

F.3d at 262 (noting that that "offhanded comments, and isolated incidents (unless

extremely serious)" are not sufficient to sustain a hostile work environment claim under

Title VII or NJLAD (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788

(1998))).  Nevertheless, the use of racial epithets is "regarded as especially egregious and

capable of engendering a severe impact."  Taylor, 706 A.2d at 690; see also Ali v.

Woodbridge Twp. Sch. Dist., 957 F.3d 174, 182 (3d Cir. 2020) (characterizing use of an

unambiguous racial epithet as severe).

Whether the racial harassment is perpetrated by a supervisor is also relevant.  "A

supervisor has a unique role in shaping the work environment.  Part of a supervisor's

responsibilities is the duty to prevent, avoid, and rectify invidious harassment in the

workplace."  Taylor, 706 A.2d at 691.  Where a supervisor does more than allow

harassment to occur but perpetrates it, the severity of conduct can be "immeasurably increased."  Id. at 692; see also Rios, 252 A.3d at 988 (explaining that "invidious harassment by a supervisor can have a greater impact than misconduct by fellow employees").  A supervisor's harassment "could taint every interaction that followed between an employee and a direct supervisor."  Rios, 252 A.3d at 990.

If a plaintiff establishes severe or pervasive conduct, courts then consider whether a reasonable person sharing the same protected characteristic would believe the conditions of employment were altered and the working environment was hostile and abusive.  Lehmann, 626 A.2d at 457-58.  To make this determination, a court considers "the totality of the circumstances, including the frequency, severity, and nature of the subject conduct."  Ali, 957 F.3d at 181.  A plaintiff's working conditions need not actually or tangibly change, nor must a plaintiff show psychological or economic harm for there to be a hostile work environment.  Taylor, 706 A.2d at 692-93; Lehmann, 626 A.2d at 456 ("Given the breadth of individual and societal harms that flow from discrimination and harassment, to limit the [NJ]LAD's application to only those cases in which the victim suffered, or could have suffered, serious psychological harm would be contrary to its remedial purpose."); Hurley, 174 F.3d at 115 (explaining "plaintiff need not demonstrate psychological harm or economic loss" in an NJLAD hostile work environment case).  Rather, a plaintiff need only show that he "reasonably fe[lt] that his sense of belonging was shaken" or "that his ability to be evaluated on an even playing

field with others when opportunities for advancement arose was lost."  Cutler, 955 A.2d at 927.

There are factual disputes concerning whether the conduct here was so severe or pervasive that it would cause a reasonable African American person to believe that the employment conditions were altered and the working environment was hostile and abusive.  The parties dispute the duration of the call, whether Nazco was laughing during the call, whether he hung up on the caller, and whether the message of the call was derogatory only to African Americans.  A reasonable jury could conclude that the call was allowed to play for a prolonged period, such that Nazco knowingly exposed the Plaintiffs to repeated use of the n-word and threatening language.  The parties also dispute circumstances around a second call, the effects of which would need to be viewed in tandem with the first.  Even if the exposure to the caller's message was shorter the second time, a reasonable jury could also conclude that the impact of the call on those present was compounded by hearing the first call.

A rational factfinder could also conclude that a reasonable African American employee could believe that being exposed by a supervisor to repeated use of the n-word, in combination with threatening language, "inject[ed] hostility and abuse into the working environment and significantly alter[ed] the conditions of his employment," even if happened on only a single occasion.  Taylor, 706 A.2d at 693; Cutler, 955 A.2d at 927 ("It is no stretch to imagine that, for the hearer/recipient of those ongoing insults to his ancestry and core beliefs, which were uttered by his coworkers and, worse, his

14

supervisors, the workplace was altered for the worse.")[7]; see also Rodgers v. W.-S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as [the n-word] by a supervisor in the presence of his subordinates." (internal citation and quotation marks omitted)); United States v. Bartow, 997 F.3d 203, 209 (4th Cir. 2021) (citing cases and stating "[T]his epithet is so loaded with a legacy of slavery and racial hatred that it is inextricably linked with prejudice and hostility toward African Americans.").

That Nazco himself did not utter the slurs is not fatal to Plaintiffs' claim, as there are genuine issues of material fact as to (1) how long he permitted the call to continue after it became clear that the n-word was being used alongside threats of violence and (2) whether he heard these racial slurs before placing the call on speakerphone.  "Racial slurs are a form of vilification that harms the people at whom they are directed."  Taylor, 706

---

[7] Indeed, four of the five Plaintiffs testified that the April 2018 incident altered their perception of the work environment in a negative way, including because they had to continue to work under Nazco.  Walls Dep. 129:7-11, 138:22-139:11, ECF No. 33-1 (testifying that it was "not comfortable to work under that setting in which the situation had put us," and that he was "placed in an uncomfortable position by [Nazco] remaining [his] supervisor"); Cruz Dep. 74:9-76:3, ECF No. 33-2 (testifying that he no longer felt comfortable with Nazco as a supervisor after the incident, and that their professional relationship was "definitely different"); Ingram Dep. 114:3-116:23, 130:19-131:1, ECF No. 33-3 (testifying that the call "made [her] feel unsafe in [her] work environment" and changed her relationship with Nazco); Lombardo Dep. 129:22-130:1, ECF No. 33-3 (testifying that the call made him feel like he "was put in an unsafe environment," and that he felt "targeted" and "betrayed . . . because the leader that [he] thought was a good leader put [him] in that circumstance").

A.2d at 691.  For those Plaintiffs who contend Nazco exposed them to a second call, a

jury could also conclude that the harms of the slurs were compounded.

Thus, if the jury find the facts to be as Plaintiffs describe, it could reasonably find

that they were harassed based on their race.

Therefore, Trane's motion for summary judgment on Plaintiffs' hostile work

environment claim is denied.[8]

B

Plaintiffs Walls, Ingram, and Stephens also bring claims of retaliation under the

NJLAD.  NJLAD prohibits reprisals against any person who complains of discriminatory

conduct.  N.J.S.A. § 10:5-1(d).  NJLAD retaliation claims are evaluated in accordance

---

[8] Trane also seeks summary judgment on the Ellerth/Faragher affirmative defense to vicarious liability.  To prevail on this defense, an employer must prove by a preponderance of the evidence that: (1) the employer exercised "reasonable care to prevent and correct promptly" any discriminatory conduct, which includes considering the five factors set forth in Gaines v. Bellino, 801 F.3d 322 (N.J. 2002), concerning the existence and efficacy of an employer's anti-discrimination practices and policies. Aguas, 107 A.3d at 1261; and (2) plaintiff failed to take advantage of preventative or corrective opportunities his employer provided, id. at 1267.

Because the undisputed record shows that Cruz filed a complaint on behalf of all Plaintiffs, No. 30-2 ¶ 71, ECF No. 31-29, and Trane interviewed each of them in a way that it seemingly treated all of them as having filed the complaint, ECF No. 30-2 ¶¶ 94-95, Trane cannot show that Plaintiffs failed to take advantage of Trane's antidiscrimination policy.  Because Trane cannot satisfy one of the two conjunctive elements, it is not entitled to summary judgment on its Ellerth/Faragher affirmative defense.  As a result, the Court need not examine whether the record contains disputed facts concerning the effectiveness of Trane's antidiscrimination policy.

Plaintiffs did not plead a claim for negligence in their complaint, ECF No. 1-1, but in their brief, they rely on Gaines to argue that Trane did not exercise "due care" in implementing an effective anti-harassment policy, Pl. Br. at 22-23.  Gaines, however, "expressly confirmed the availability of an affirmative defense to vicarious liability based on an effective policy," Aguas, 107 A.3d at 1264, and the Court has determined that the defense is inapplicable here.

with the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411

U.S. 792, 802-04 (1973).  <u>See</u> <u>Battaglia v. United Parcel Serv., Inc.</u>, 70 A.3d 602, 619

(N.J. 2013).  The framework first requires a plaintiff to establish the following to show a

prima facie claim: (1) he engaged in protected activity known to the employer; (2) he

suffered an adverse employment action; and (3) there was a causal connection between

the protected activity and the adverse employment action.  <u>Id.</u>  If a plaintiff establishes a

prima facie claim, the burden then shifts to the employer to articulate a legitimate,

nondiscriminatory reason for the adverse employment action.  <u>Andersen v. Exxon Co.,</u>

<u>U.S.A.</u>, 446 A.2d 486, 493 (N.J. 1982).  If the employer meets that burden, the plaintiff

"has the opportunity to prove by a preponderance of the evidence that the legitimate

nondiscriminatory reason articulated by the defendant was not the true reason for the

employment decision but was merely a pretext for discrimination."  <u>Id.</u>

Filing a complaint of discrimination is protected activity.  N.J.S.A. 10:5–12(d).

To demonstrate an adverse employment action, "a plaintiff must show that a reasonable

employee would have found that the employer's action as one that "might . . . dissuade[]

a reasonable worker from making . . . a charge of discrimination."  <u>Roa v. Roa</u>, 985 A.2d

1225, 1236 (N.J. 2010) (quoting <u>Burlington N. & Sante Fe Ry. Co. v. White</u>, 448 U.S.

53, 68 (2006)); <u>Marrero v. Camden Cnty. Bd. of Soc. Servs.</u>, 164 F. Supp. 2d 455, 473

(D.N.J. 2001) ("[R]etaliatory conduct must affect adversely the terms, conditions, or

privileges of the plaintiff's employment or limit, segregate or classify the plaintiff in a

way which would tend to deprive her of employment opportunities or to otherwise affect

her status as an employee."); <u>Daniels v. Sch. Dist. of Phila.</u>, 776 F.3d 181, 196 (3d Cir.

2015) ("'Petty slights, minor annoyances, and simple lack of good manners' generally will not suffice." (quoting <u>Burlington</u>, 448 U.S. at 68)).  Termination, discipline, negative performance reviews, and lateral transfers may constitute adverse actions.  <u>See</u> <u>Spence v. New Jersey</u>, No. 1:19-cv-21490, 2021 WL 1345872, at *9-10 (D.N.J. Apr. 12, 2021).

To establish a causal link between the protected action and the adverse actions, courts may consider temporal proximity.  <u>Daniels</u>, 776 F.3d at 196 (quoting <u>LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 232 (3d Cir. 2007)).  Temporal proximity may be sufficient to demonstrate a causal link where it is "unusually suggestive."  <u>Id.</u> (quoting <u>LeBoon</u>, 503 F.3d at 232).[9]  Where temporal proximity is lacking, a court may consider "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action."  <u>Id.</u>  Additionally, the individual taking adverse

---

[9] A period of one week between the complaint and adverse action can be "sufficiently close to create an inference that discharge was causally connected to protected activity."  <u>Nuness v. Simon & Schuster, Inc</u>, 221 F. Supp. 3d 596, 606 (D.N.J. 2016).  By contrast, a period of several months is insufficient to show unusually suggestive temporal proximity.  <u>Daniels</u>, 776 F.3d at 198 (concluding no unusually suggestive temporal proximity when ten months passed between the protected activity and adverse employment action); <u>LeBoon</u>, 503 F.3d at 233 (same, but with a three-month gap); <u>Andreoli v. Gates</u>, 482 F.3d 641, 650 (3d Cir. 2007) (same, but with a five-month gap).  Some of the allegedly retaliatory conduct here either occurred on an unknown date or was insufficiently close in time to the April 2018 complaint to be unusually suggestive.  Thus, Plaintiffs have not provided evidence from which a reasonable jury could infer causation through temporal proximity.

action must have knowledge of the plaintiff's protected conduct at the time the adverse action occurs to establish a causal link.  Id.

All Plaintiffs understood the complaint Cruz submitted to be on their behalf. Thus, all Plaintiffs engaged in protected conduct.  The Court next considers whether Walls, Ingram, or Stephens suffered an adverse employment action and, if so, whether there was a causal connection between the filing of the complaint and that adverse employment action.

1

Walls did not suffer an adverse employment action.  Walls identified the following as impacting his employment: (1) he was not supported by Nazco on three occasions when Walls was addressing his subordinates' performance issues; (2) he was subjected to a drug test; (3) he was excluded from decision-making on three occasions; and (4) he felt unsupported by the Company and that his job was made more difficult.  ECF No. 30-2 ¶¶ 121-24, 127-29, 139-40.  Walls suffered no loss of job, pay, or hours, and was not demoted.  ECF No. 30-2 ¶¶ 133, 139-40, 142.  Other than with respect to the drug testing, Walls's testimony did not provide a basis for a reasonable jury to conclude that certain vaguely described personnel matters or other decisions adversely impacted his working conditions.  As to the drug test, there are no facts showing a causal link between the drug test and the April 2018 complaint.  Trane's policy provides for random drug testing, and it is undisputed that Walls had been subject to a random drug trust before the April 2018 complaint.  ECF No. 30-2 ¶¶ 130, 132.  Other than the fact the complained-of test occurred sometime after the protected act, Walls has pointed to no evidence that suggests

retaliatory animus.  Moreover, he has not shown that anyone with knowledge of the April 2018 complaint was responsible for subjecting him to the drug test.  ECF No. 30-2 ¶¶ 127-28.  Accordingly, Trane's motion for summary judgment on Walls's NJLAD retaliation claim will be granted.

2

Ingram also fails to show that she suffered an adverse employment action after the complaint was filed.  Ingram asserts that the following occurred: (1) Nazco once did not support her in connection with a subordinate's performance issue; (2) she received a warning for November 1, 2018 cellphone use; and (3) she was moved from Receiving to Shipping in 2019.  ECF No. 30-2 ¶ 150-51, 155-58, 164-65.  Nazco's purported failure to support her in addressing a vaguely described personnel matter does not constitute an adverse employment action.

Even assuming the November 2018 warning[10] or transfer[11] constituted adverse employment actions and Ingram could establish causation, there were legitimate, non-

---

[10] Written warnings or reprimands untethered to a progressive discipline system, or which do not result in a change in pay or job, are not adverse employment actions. Prager v. Joyce Honda, Inc., 146 A.3d 177, 187 (N.J. Super. Ct. App. Div. 2016); see also Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001), overruled in part on other grounds by Burlington, 548 U.S. at 53 (written reprimands that were not permanently fixed to employment file did not constitute adverse employment action sufficient to support a retaliation claim); Hoist v. New Jersey, No. 12-cv-5370, 2015 WL 4773275, at *15 (D.N.J. Aug. 13, 2015) (written reprimands that did not result in change in hours or work duties, decrease wages, or otherwise result in denial of pay raise or promotion did not qualify as adverse employment actions).  Here, there is no evidence that the cellphone warning would have triggered the company's progressive discipline system, and Ingram did not lose employment, pay, or hours as a result of the warning.  ECF No. 30-2 ¶ 161.

[11] Lateral transfers constitute an adverse employment action where there is an economic impact or a material change in the terms or conditions of employment, such as

discriminatory reasons for each action.  As to the November 2018 warning, Ingram does

not dispute that she used her cellphone for non-work purposes, in violation of Trane's

policies.  ECF No. 30-2 ¶¶ 157-58.  While Ingram testified that Brown made a comment

that suggested to her that Nazco was behind the warning,  Ingram Dep. 137:1-9, ECF No.

33-3, this does not undermine the fact that Ingram engaged in prohibited conduct,  ECF

No. 30-2 ¶¶ 157-58.  Similarly, Ingram has not shown that the stated reason for her 2019

transfer—cross-training—was mere pretext.[12]  Accordingly, Trane's motion for summary

judgment on Ingram's NJLAD retaliation claim will be granted.

C

Stephens's retaliation claim also fails.  Stephens asserts the following occurred:

(1) on November 7, 2018, Nazco "walked" him "off the job," and he was suspended for

five days; and (2) he was transferred from Supermarket to Steel Receiving in 2019.  ECF

No. 30-2 ¶ 169.  Trane argues that the transfer does not constitute an adverse employment

---

reassignment to more arduous or less desirable tasks, or significant, non-temporary
changes in employment status.  Victor v. State, 952 A.2d 493, 616 (N.J. Super. Ct. App.
Div. 2008); see also Mancini v. Twp. of Teaneck, 794 A.2d 185, 208-09 (N.J. Super. Ct.
App. Div. 2002) (noting that "disadvantageous transfers or assignments" could constitute
an employment action, as well as reassignment to "different or less desirable tasks");
Gitto v. City of Atl. City, No. A-0197-11T2, 2013 WL 1830688, at *5 (N.J. Super. Ct.
App. Div. May 2, 2013) (noting that a job reassignment with "no corresponding reduction
in wages or status" is not an adverse employment action).  Ingram admits that she is
doing the same job after her transfer, ECF No. 30-2 ¶ 165, and she did not lose any
benefits or wages as a result.

[12] Ingram also alleges that her transfer from Receiving to Shipping, during which
she experienced no change in title, pay, or work hours, was the result of engaging in
protected conduct.  Ingram has presented no evidence that whoever made the decision to
transfer her knew about the complaint.

21

action and that Stephens cannot establish a causal link between either the transfer or his November 2018 discipline and his April 2018 complaint.

Stephens's five-day suspension in November 2018 constitutes an adverse employment action. He lost a week of pay and received a warning for disruptive behavior. ECF No. 33-2 at 43; ECF No. 30-2 ¶ 183. A loss of pay and accompanying warning is materially adverse, as it could "dissuade[] a reasonable worker from making or supporting a charge of discrimination." Roa, 985 A.2d at 1236 (quoting Burlington, 448 U.S. at 68); see also Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 220 (3d Cir. 2017) (concluding that a reasonable employee could view a reduction of work hours "and resulting decreased pay" as sufficient to discourage him or her from engaging in protected activity).[13]

Even if Stephens could establish a causal link between the walk-off and the April 2018 complaint,[14] however, he has not shown that Trane's reason was pretextual. It is undisputed that Stephens was ultimately suspended for disruptive conduct pertaining to a conflict with one of his subordinates. Nazco walked Stephens off the job and suspended

---

[13] Like Ingram, Stephens alleges that his transfer from Supermarket to Steel Receiving, during which he experienced no change in title, pay, or work hours, was the result of engaging in protected conduct. Even if he could establish a causal link between his transfer and his protected conduct, he has not shown that Trane's legitimate non-discriminatory reason for the transfer—cross-training—was pretextual.

[14] While Stephens testified that he believed the November 2018 discipline was the result of Nazco finding out about the August 2018 NJDCR complaint, he also testified that he had no proof and has not otherwise identified any evidence showing that Nazco was aware of this complaint. ECF No. 30-2 ¶¶ 185-86. Because an individual necessarily must be aware of protected conduct for an adverse employment action to be the result of that conduct, he cannot show that he was retaliated against for having filed the August 2018 complaint.

him after Stephens loudly complained about the conflict to a coworker.  ECF No. 30-2 ¶¶ 173-81.  Trane issued a warning to Stephens for disruptive conduct.  ECF No. 30-2 ¶¶ 182-83.  Stephens has not adduced evidence that the warning and suspension were pretext to punish him for the April 2018 complaint.  Accordingly, Trane's motion for summary judgment on Stephens's NJLAD retaliation claim will be granted.

III

      For the foregoing reasons, Trane's motion for summary judgment is granted as to the retaliation claims of Plaintiffs Walls, Ingram, and Stephens, and denied as to all Plaintiffs' harassment claims.